Santana v Peter Thomas Roth Labs LLC (2025 NY Slip Op 25142)

[*1]

Santana v Peter Thomas Roth Labs LLC

2025 NY Slip Op 25142

Decided on June 14, 2025

Supreme Court, Kings County

Maslow, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on June 14, 2025
Supreme Court, Kings County

Gregorio Santana, Plaintiff,

against
Peter Thomas Roth Labs LLC, RYAN ROTH, MELLY AUTO SALES INC., and JONATHAN BAEZ, Defendants.

Index No. 506907/2018

Aaron D. Maslow, J.

This is an action to recover damages for personal injuries and future medical expenses allegedly sustained by Plaintiff Gregorio Santana ("Plaintiff") as a result of a motor vehicle accident that occurred on August 21, 2017. On that date, Plaintiff was a passenger in a vehicle operated by Defendant Jonathan Baez ("Defendant Baez") and owned by Melly Auto Sales Inc. While traveling on the Brooklyn Queens Expressway, Defendant Baez gradually slowed down in traffic. The vehicle operated by Defendant Ryan Roth ("Defendant Roth") and owned by Peter Thomas Roth Labs LLC ("Defendant Peter Thomas Roth") failed to reduce speed in time and struck the Baez vehicle from the rear.
The issue of liability was resolved on July 15, 2019 and February 3, 2020, when summary judgment on liability was granted to Plaintiff against Defendant Roth and Defendant Peter Thomas Roth respectively (see NYSCEF Doc Nos. 41, 88). Accordingly, the sole issue remaining for trial is the determination of damages.
Before the Court is Plaintiff's motion in limine, dated June 1, 2025, seeking to preclude any reference to Plaintiff's immigration status at trial. Plaintiff argues that his immigration status is irrelevant because he is not asserting a claim for lost wages and there is no indication that he intends to return to his country of origin, citing Angamarca v New York City Partnership Hous. Dev. Fund, Inc. (87 AD3d 206, 208 [1st Dept 2011]). Plaintiff further contends that any reference to his immigration status would serve only to unfairly prejudice the jury, and that individuals, regardless of immigration status, have the right to pursue civil litigation, citing Balbuena v IDR Realty LLC (6 NY3d 338, 361 [2006]).
In opposition, Defendants argue that Plaintiff's immigration status is relevant and material for two primary reasons: (1) it bears on the determination of future damages, and (2) it is pertinent to Plaintiff's credibility. Among the cases cited by Defendants is Maliqi v 17 E. 89th St. Tenants, Inc. (25 Misc 3d 182 [*2][Sup Ct, Bronx County 2009]). Defendants emphasize that this motion in limine marks the first time that they were made aware that Plaintiff's immigration status was at issue and highlights Plaintiff's failure to make a lost wage claim, presumably because of his immigration status, which bears on his credibility. Defendants also assert that Plaintiff has cited no authority holding that, in the absence of a lost wages claim, disclosure of immigration status is prejudicial or irrelevant, and rely on Komuves v Cucinotto, 2012 NY Slip Op. 30303[U] [Sup Ct, Suffolk County 2012].
In addition, Defendants argue that cases cited by Plaintiff, Balbuena v. IDR Realty, LLC (6 NY3d 338) and Angamarca v. New York City Partnership Hous. Dev. Fund, Inc. (87 AD3d 206), are distinguishable, as the plaintiffs in those cases disclosed their immigration status during discovery. Here, by contrast, Plaintiff has not done so. Finally, Defendants contend that, given the current political climate and increased immigration enforcement, the possibility of deportation is not speculative. They therefore maintain that they should be permitted to introduce evidence regarding Plaintiff's potential return to his country of origin, via deportation or by choice, and the likely reduction in future medical expenses that such a return would entail.
In Maliqi v 17 E. 89th St. Tenants, Inc. (25 Misc 3d 182), the Court addressed whether an undocumented construction worker seeking political asylum, who brought a workplace injury action against a building owner, could preclude evidence regarding his potential deportation in connection with the calculation of future lost wages and medical expenses. The Court held that "reference to Plaintiff's immigration status is rationally related to his recovery of future wages and medical expenses and as such, evidence relevant to the issue will be allowed at trial" (id. at 189). However, the court clarified that while immigration status may be relevant to the assessment of damages, it does not bar recovery, and no evidence may be presented to suggest that the plaintiff was working illegally at the time of the injury.
In Angamarca v New York City Partnership Hous. Dev. Fund, Inc. (87 AD3d 206), the Appellate Division, First Department, affirmed the trial court's exercise of discretion in precluding testimony regarding the plaintiff's undocumented immigration status and his prior desire to return to Ecuador, in connection with the damages stemming from a construction site accident. The Court stated: "Any argument, by defendant, that plaintiff was subject to deportation to Ecuador or had expressed an interest, prior to the accident, in some day returning to Ecuador, in an effort to suggest that plaintiff would incur lower medical expenses in Ecuador than in the United States, would have been inappropriate" (id. at 209).
To the extent that Maliqi and Angamarca are in conflict, this Court is bound to follow the authority of the Appellate Division, First Department, as set forth in Angamarca, since the Second Department has not yet ruled on the issue (see Mountain View Coach Lines, Inc. v Storms, 102 AD2d 663 [2d Dept 1984]). Based on the foregoing review of case law and the Court's review of the filed papers pertaining to this motion in limine, the Court does not agree with Defendants' position.
This conclusion is especially warranted in light of the intensified political climate that, as Defendants themselves note, has made the immigration status of individuals increasingly vulnerable. Plaintiff might be at substantial risk of undue jury prejudice and inflammatory bias were evidence of his immigration status permitted at trial.
This Court finds further that exposing the immigration status of Plaintiff could subject him to serious risks that undermine the integrity of the judicial process. In fact, permitting broad inquiry into a person's immigration status risks creating a significant chilling effect: If courtrooms are perceived as opportunities for ICE enforcement, undocumented immigrants might cease to exercise the civil right of pursuing compensation for personal injuries resulting from a tortfeasor's negligence.
Publicly revealing that a party or witness is potentially undocumented opens the door for someone — whether an opposing party, a spectator, or even a juror — to contact the Immigration and Customs Enforcement ("ICE") tipline, potentially triggering immigration enforcement actions. This could result in the individual being detained or removed from the country in the middle of ongoing legal [*3]proceedings, depriving them of due process and jeopardizing the fairness of the trial.[FN1]
 To ensure justice is [*4]served and that all parties can fully participate in their legal defense or testimony, immigration status must be treated as irrelevant and inadmissible unless it is directly material to the case.[FN2]

Moreover, the Court notes that Defendants could have sought information regarding Plaintiff's immigration status during his deposition had they wished to do so. Finally, Defendants' argument concerning Plaintiff's failure to assert a lost wages claim is collateral to the issue at hand and does not justify the admission of immigration-status related evidence.
Accordingly, while Defendants may inquire as to whether Plaintiff has plans to return to his country of origin, and whether he would receive medical treatment there upon return, no questions or references whatsoever concerning Plaintiff's immigration status or the likelihood of U.S. ICE enforcement or deportation will be permitted.
Accordingly, Plaintiffs' motion in limine to exclude evidence regarding his immigration status is GRANTED.
THE FOREGOING CONSTITUTES THE DECISION AND ORDER OF THIS COURT.

Footnotes

Footnote 1:This is not idle speculation, witness the recent controversy concerning arrests of persons by ICE at the Milwaukee County Courthouse (e.g. Isiah Holmes, Wisconsin Examiner, Details emerge about Milwaukee courthouse arrests by ICE, available at https://wisconsinexaminer.com/2025/04/09/details-emerge-about-milwaukee-courthouse-arrests-by-ice/ [last accessed June 9, 2025]).
New York precludes immigration law enforcement in and about courthouses (see NYS Unified Court System, New York State Courts and ICE Arrests in Courthouses, available at https://www.nycourts.gov/courthelp/GoingToCourt/ICE.shtml [last accessed June 9, 2025]). Judiciary Law § 4-a provides: "In order to maintain access to the court and open judicial proceedings for all persons in their individual capacity and to prevent interference with the needs of judicial administration, a court has the power to issue appropriate judicial orders to protect the privilege from civil arrest, in accordance with article three of the civil rights law." Civil Rights Law § 28 (1) provides: "A person duly and in good faith attending a court proceeding in which such person is a party or potential witness, or a family or household member is a party or potential witness, is privileged from civil arrest while going to, remaining at, and returning from, the place of such court proceeding, unless such civil arrest is supported by a judicial warrant or judicial order authorizing such civil arrest." Nonetheless, based on the following news article, apparently the federal government has reconsidered its policy of complying with state laws and policies with respect to arrests in and about courthouses.

It has recently been reported as follows:

Immigration and Customs Enforcement has quietly rescinded guidance that advised ICE agents conducting courthouse raids to take steps to avoid violating state and local laws while carrying out civil immigration arrests. The subtle policy change could lead to an escalation in enforcement tactics and legal disputes.

Revised policy guidance recently posted to ICE's website and reviewed by WIRED reveals efforts by the agency to enhance the discretion and autonomy of the federal agents making arrests in and around courthouses—one of the more aggressive initiatives employed by the Trump administration as part of its all-out push to round up migrants across the United States and its territories. The policy revision has not been previously reported.

In recent weeks, ICE agents have made high-profile arrests of immigrants attending routine court hearings, as part of the administration's effort to conduct what Trump calls the largest deportation campaign in American history.

The change in guidance comes amid sweeping ICE raids across the US, some sparking protests and heated confrontations with citizens, threatening an erosion of local autonomy and democratic governance over law enforcement operations within communities, while further blurring the line between civil and criminal enforcement.

Interim guidance, issued in January by ICE's former acting director, Caleb Vitello, ordered agents to ensure that courthouse arrests were "not precluded by laws imposed by the jurisdiction in which enforcement actions will take place." Todd Lyons, the current acting director, issued a superseding memo dated May 27 that removes the language about respecting local laws and statutes that limit ICE agents from performing "enforcement actions" in or near courthouses.

"The old policy required ICE to consult with a legal adviser to determine whether making an arrest at or near a courthouse might violate a nonfederal law. The new policy eliminates that requirement," says Anthony Enriquez, vice president at RFK Human Rights, a human rights advocacy nonprofit. "Now, these frequently complex legal questions fall to the judgment of a line officer untrained in local laws."

"It is certainly yet another effort to unleash and expand ICE's enforcement operations without regard to state law," says Emma Winger, deputy legal director at the American Immigration Council.

Federal policy guidance is not legally binding, but it carries the power of law in practice, mandating procedures that ICE agents must follow in carrying out enforcement operations.

In response to a request for comment, ICE spokesperson Mike Alvarez referred WIRED to the May 27 memorandum. ICE declined to clarify whether it would continue to consider local courthouse policies and security protocols during enforcement actions.

Vitello, responsible for issuing the original guidance, was appointed ICE acting director by President Donald Trump soon after inauguration. Vitello was removed in late February and reportedly transferred to oversee the agency's deportation operations. Lyons assumed the acting directorship in March.

The Biden administration previously limited ICE enforcement actions in and around courthouses in 2021, saying the arrests—which reportedly spiked during Trump's first term—"had a chilling effect on individuals' willingness to come to court or work cooperatively with law enforcement." (Wired, ICE Quietly Scales Back Rules for Courthouse Raids, available at https://www.wired.com/story/ice-quietly-scales-back-rules-for-courthouse-raids/ [last accessed June 9, 2025]).

The Court's concern about the interruption of proceedings in the trial have been enhanced in recent days in light of the even more recent news that the federal government has sued New York to have Civil Rights Law § 28 (1) declared unconstitutional insofar as federal detention of persons inside state courthouses is concerned (see Brian Lee, DOJ Files Challenge to New York Law Preventing Civil Arrests of Migrants at Courthouses, NYLJ, June 13, 2025 at 1, col 3).

This Court expresses no opinion with respect to the federal government's enforcement of immigration laws or litigation by or against the federal government in any immigration matter or lawsuit, including the one instituted against New York which is mentioned above. This Court's sole concern is with the potential disruption of this trial and with the parties' right to have their dispute adjudicated in a fair, tranquil manner.
Footnote 2:By not inquiring about Plaintiff's home country during his deposition, Defendants have waived their right to present evidence as to the specific costs of medical treatment in such country. Nonetheless, Defendants may inquire as to any intention Plaintiff may have of returning there, so as to present the jury with the opportunity to consider that medical treatment costs would be lower for Plaintiff if he does possess such intention, the costs of medical expenses being lower in many countries than those in the United States.